**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| **UNITED STATES OF AMERICA,** |
| **-against-** |
| **LACY DOYLE,** |

**16-CR-506 (ALC)**

**OPINION AND ORDER**
**GRANTING DEFENDANT'S**
**MOTION TO PRECLUDE**

**ANDREW L. CARTER, JR., United States District Judge:**

Before the Court is Defendant's Motion to Strike Allegations From the Indictment and to Preclude Evidence Related to Those Allegations and Motion to Suppress Evidence Obtained Pursuant to a Search Warrant (ECF No. 64). Specifically, the Defendant seeks to preclude two categories of evidence: first, her invocation of her Fifth Amendment privilege on her 2010-2015 tax returns; and, second, her alleged withholding of documents in response to a grand jury subpoena from approximately 2014 to 2017. For separate, but related reasons discussed in further detail below, the first category of evidence at issue is easily subject to preclusion, while the second category, though more analytically rigorous, ultimately must be precluded as well. Thus, Defendant's motion to preclude is GRANTED. For reasons also set forth below, Defendant's motion to strike is rendered academic, and is thus DENIED as moot. In addition, for the reasons set forth on the record at the February 9, 2018 status conference and in subsequent written orders, the Court reserves ruling on the suppression portion of Defendant's motion.

## BACKGROUND

On July 26, 2016, the Government filed a two-count indictment charging the Defendant with obstructing and impeding the due administration of the Internal Revenue Laws (26 U.S.C. § 7212(a)) and subscribing to a false and fraudulent U.S. Individual Income Tax Return (26 U.S.C.

§ 7206(1)). Indictment (ECF No. 1). On September 14, 2017, a three-count superseding indictment was filed, adding some facts and one count of conspiracy to, among other things, defraud the United States (18 U.S.C. § 371). Superseding Indictment (ECF No. 59-1). These charges allege that Defendant and others unlawfully hid Defendant's foreign bank accounts from the IRS from approximately 2003 to 2017. The following factual summary is, in large part, derived from the brief filed by the Government in opposition to this motion, duplicating significant portions verbatim.

## I.     The Primary Allegations

In 2003, Defendant's father died and left her an inheritance of over $4 million. *Id.* ¶¶ 23-25, 29, 34. The Defendant, who was also executor of her father's estate, made court filings falsely stating under penalty of perjury that the total value of her father's estate was under $1 million when, in fact, it was more than four times that amount. *Id.* In 2006, the Defendant sought the help of Beda Singenberger, a Swiss citizen who ran a financial advisory firm, to open a Swiss bank account into which the inheritance was deposited. *Id.* ¶ 34. To conceal the existence of the account, the Defendant and Singenberger established a trust in Lichtenstein named Gestino Stiftung ("Gestino" or "Gestino Foundation") to hold the Swiss bank account in its name. *Id.* As of December 31, 2008, the account held currency and financial instruments valued at approximately $3,548,380. *Id.* ¶ 41. In 2010, Gestino re-domiciled from Lichtenstein to Panama. *Id.* ¶¶ 45, 47. As of December 31, 2016, Gestino maintained assets in various Swiss bank accounts in the amount of at least approximately $3,028,562. *Id.* ¶ 53.

The Defendant is alleged to have used this arrangement to unlawfully and fraudulently avoid paying over $1.5 million dollars in United States taxes resulting from the inheritance. For each of the tax years from 2004 through 2009, the Defendant failed to report any income from foreign accounts in her tax filings, and also stated in those filings that she did not have an interest in or signatory or other authority over a financial account in a foreign country (the "Foreign Accounts Question"). *Id.* ¶ 63.

## II.     The Subpoena Litigation

On October 4, 2010, the Defendant was issued a grand jury subpoena (the "2010 Subpoena") seeking records from the period October 5, 2005 to the date of the subpoena relating to, among other things, foreign accounts, "including but not limited to records required to be maintained pursuant to 31 C.F.R. § 103.32 . . ." Affirmation of Frederick P. Hafetz ("Hafetz Aff."), Ex. 6 (ECF No. 66). In response, the Defendant raised a Fifth Amendment objection through her counsel, Alain Liebman, Esq., arguing primarily that the required records exception to the Fifth Amendment privilege does not reach to documents required to be kept pursuant to the Bank Secrecy Act, 31 C.F.R. §§ 103.24, 103.32. Hafetz Aff., Ex. 8 at 1. Counsel further suggested that Defendant did "not concede that [she] possess records which are described in Section 103.32" and that, even if she did possess such records, she did not fall within the regulations' "definitional criteria." *Id.* at 1-2.

On November 9, 2012, the Government moved to compel compliance with the subpoena. In a reply memorandum in support of its argument, the Government argued, among other things, that Defendant's alternative argument that "she is not required by the applicable regulations to maintain records of foreign bank accounts" should be addressed by the Court now in order to prevent the Government from having to file a second motion to compel. Hafetz Aff., Ex. 10 at 14.

In an order dated February 19, 2013, Judge Pauley granted the Government's motion, concluding that, because the Defendant was required to keep certain records pursuant to the Bank Secrecy Act, the "Required Records doctrine negates the act of production privilege[.]" Hafetz Aff., Ex. 14 at 4, 8. Near the conclusion of the opinion, in a short paragraph, Judge Pauley addressed Defendant's argument that she was "not covered by the Bank Secrecy Act regulations" and concluded that "at this point in the investigation, the Government need not prove that the regulation or the Bank Secrecy Act apply" because the precise purpose of a grand jury subpoena is to determine whether probable cause exists. *Id.* at 14 (citing, *inter alia, In re M.H.*, 648 F.3d 1067, 1071 (9th Cir. 2011)).

On April 23, 2013, Judge Pauley issued an order, based in part upon review of a stipulation signed by the Defendant, acknowledging that she, among others, continued to refuse to comply with the 2010 Subpoena, intended to appeal the Court's prior order, and required a civil contempt finding in order to do so. Hafetz Aff., Ex. 18. Thus, Judge Pauley found the Defendant in civil contempt and stayed the imposition of sanctions pending appeal. *Id.*

On March 28, 2014, after withdrawing her appeal to the Second Circuit because she could no longer pursue it in good faith on account of a recent decision bearing adversely on the question at issue in her appeal, *see In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d 339 (2d Cir. 2013), the Defendant produced to the Government two e-mails from representatives of a foreign bank sent to her in 2008 and 2010, respectively. Hafetz Aff., Ex. 20-22. Included with Defendant's production was a letter in which defense counsel noted that "[s]ubsequent developments have compelled the conclusion that, while the assertion was believed to be legally founded and correct, and was tendered in good faith, the Fifth Amendment privilege may no longer tenably be asserted to the contested portion of the Subpoena." Hafetz Aff., Ex. 22 at 1. Counsel further informed the Government that, while Defendant did not concede that the relevant parts of

the Code of Federal Regulations governing record-keeping "encompass any account in any foreign financial institution connected to her," she did "not assert the non-applicability of those regulations" nor any "other privilege as a basis to decline to produce records responsive" to the 2010 Subpoena. *Id.* at 2.

On October 2, 2014, the Government sent a letter to Defendant's counsel inquiring as to whether the three pages of documents Defendant had produced constituted all documents in her care, custody, or control responsive to the 2010 Subpoena, in light of the above caveat. Hafetz Aff., Ex. 23 at 3. On October 9, 2014, defense counsel responded that the documents produced constitutes her complete production "required by the subpoena to be produced, once the subpoena's verbiage is conformed to that found in [31 C.F.R.] Section 1010.420[.]" Hafetz Aff., Ex. 24 at 1. Counsel elaborated that:

> [t]o the extent [the Government] seeks a kind of interrogatory-like answer or attorney gloss, I respectfully decline to provide it, and one is of course not compelled by the subpoena. Contextual understanding and discussion may have its time and place here, but given the Fifth Amendment minefield in this subpoena area, and the very narrow pathway which the Second Circuit has provided to the Government and attorneys to traverse it, it would be especially imprudent to venture gratuitously further in regard to the subpoena.

*Id.* at 1-2.

Not until June 1, 2016 does it appear that the Government contacted Defendant again regarding her production. Between June 1, 2016 and June 8, 2016, counsel conferred about Defendant's production. Hafetz Aff., Exs. 25-26, 28. On June 2, 2016, Defendant was issued another grand jury subpoena (the "2016 Subpoena"), seeking records from June 3, 2011 to the date of the subpoena relating to, among other things, foreign accounts, "including but not limited to records required to be maintained pursuant to 31 C.F.R. § 1010.420. . ." Hafetz Aff., Ex. 27. In letters dated June 8, July 15, August 9, and August 16, 2016, defense counsel, among other things,

contested the breadth of the 2016 Subpoena as being beyond the scope of the "Required Records" doctrine (and thus subject to Fifth Amendment objections). Hafetz Aff., Exs. 28, 30-32. Specifically, defense counsel argued that because the 2016 Subpoena "calls for records concerning accounts in which [Defendant], *inter alia*, has a 'present or future financial interest, [or] legal interest[,]'" the subpoena "expand[ed] the scope of the 'required records' doctrine beyond that sanctioned by the Second Circuit in *In re Grand Jury Subpoena, dated Feb. 2, 2012*, 741 F.3d 339 (2d Cir. 2013)" and thus "entrenche[d] upon the Fifth Amendment privilege[.]" Hafetz Aff., Ex. 30 at 1-2.

On June 13, 2016, the Government moved for the imposition of additional contempt sanctions, in light of Defendant's failure to produce documents responsive to the 2010 Subpoena "that she had the legal authority to obtain from any other person or entity, including foreign banks and foundations." Hafetz Aff., Ex. 29 at 22. The Government noted that it had received documents from Lichtenstein in December 2015 suggesting that the Defendant held foreign bank accounts through the Gestino Foundation, none of which was the subject of the Defendant's prior production. *Id.* at 11-14.

Defendant opposed, asserting, among other things, three arguments that arguably related to her Fifth Amendment privilege. First, she strenuously argued that she did not have legal control over documents held overseas by foreign banks and did not know which banks maintained accounts for the Gestino Foundation. Hafetz Aff., Ex. 33. Thus, these records were not "kept" or "retained" by her under the meaning of 31 C.F.R. § 1010.420. *Id.* at 20. She advanced this argument as to both the 2010 and 2016 subpoenas. *Id.* at 13-14. Second, Defendant argued that she lacked a requisite associational interest in the Gestino Foundation's records because the operative rule in 2010 required a merely financial interest or signature authority but had since been

6

revised to include U.S. persons who cause an entity to be created for the purpose of evasion of recordkeeping. *Id.* at 27. And, third, Defendant objected on the ground that, in light of the recent filing of the indictment against Defendant, the relief that the Government was seeking would "undermine [Defendant's] trial rights under the Fifth and Sixth Amendment . . . ." *Id.* at 31. The Government's reply brief asked Judge Pauley to impose additional contempt sanctions and to compel Defendant to respond to the 2016 Subpoena. Hafetz Aff., Ex. 34 at 15.

During a November 3, 2016 oral argument on the Government's contempt motion, defense counsel repeatedly denied that Defendant was obliged to procure records from foreign entities or banks and disclaimed knowledge of the Gestino Foundation's activities. Hafetz Aff., Ex. 35. Specifically, counsel informed the Court that, because Defendant was a "discretionary beneficiary, not the sole beneficiary[,]" "[w]e have no [Gestino Foundation] records, didn't then, don't now. We don't know where the account is located. My client is a discretionary beneficiary, not the sole beneficiary . . . So we don't know where it is." *Id.* at 19:21-25. Counsel also stated that the Gestino Foundation did "not have any responsive records." *Id.* at 17:19-20. And, finally, counsel represented to the Court that "Your sanctions will have no effect. One cannot produce what one doesn't have. My client would have to fabricate records in the basement in order to comply with an order. . . ." *Id.* at 20:22-24. Because Defendant had no responsive records, counsel argued, Judge Pauley's sanctions would "have no effect." *Id.* at 20.

On January 24, 2017, in a 21-page written decision, Judge Pauley found Defendant in civil contempt based on her failure to respond to the 2010 Subpoena. Hafetz Aff., Ex. 36 at 20. Recognizing "[t]he primary issue underlying the dispute between the parties . . . [was] whether Doyle was required to produce foreign bank account records that are not in her immediate physical possession[,]" Judge Pauley concluded that Defendant "violated the Compulsion Order" because

her "2014 production fell far short of her obligation to produce records in her 'care, custody, or control' . . . ." *Id.* at 6, 14. The Court further emphasized that the production of documents would not interfere with Defendant's trial rights for a number of reasons, reasoning that the production would not violate Defendant's Fifth Amendment rights because the Court had "narrowed the universe of documents to 'required records' which, by their very nature, bear no independent communicative element and therefore do not present the risk of self-incrimination under the Fifth Amendment." *Id.* at 17. In addition, despite acknowledging Defendant's obligation to "make a good faith effort" to produce documents responsive to the 2010 and 2016 Subpoenas, the Court made no affirmative finding of bad faith on Defendant's part. *Id.* at 13-14, 20. Judge Pauley directed that Defendant be fined $1,000 per day, beginning on February 14, 2017, until she "produces documents responsive to the 2010 Subpoena and 2016 Subpoena in accord with this Opinion and Order." *Id.* at 20-21.

Following Judge Pauley's order, the defendant made document requests to several foreign entities, resulting in a limited production of documents. *See* Hafetz Aff., Exs. 37-45. On February 8, 2017, Defendant moved to purge contempt sanctions imposed by Judge Pauley. Hafetz Aff., Ex. 46. That motion was denied because Defendant had not produced the documents at issue and had not exhausted all means of doing so. Hafetz Aff., Ex. 48. Defendant then issued further directives to certain foreign entities, which resulted in an additional production of documents. Hafetz Aff., Exs. 49-52, 55. On March 29, 2017, defense counsel again moved to purge contempt sanctions. Hafetz Aff., Ex. 62. On April 3, 2017, Judge Pauley again denied the request, reasoning that "a good faith effort to comply does not amount to full and actual compliance" and rejecting the defendant's claims that requiring her to sign a directive to a particular foreign bank, Credit Suisse, violated her Fifth Amendment rights. Hafetz Aff., Ex. 65 at 3-8.

Approximately two weeks later, Defendant again moved to purge the contempt sanctions, arguing that Credit Suisse's insistence upon the removal of any reference to the compelled nature of the directive violated Defendant's Fifth Amendment rights. Hafetz Aff., Ex. 70. On May 25, 2017, Judge Pauley again denied Defendant's motion, reasoning that Defendant "'carries the keys of [her prison] in [her] own pocket,' but appears reluctant to utilize all but one." Hafetz Aff., Ex. 74 at 6-7. In so holding, however, Judge Pauley described Defendant's counsel as "competent, experienced, and sophisticated[.]" *Id.* at 7. Judge Pauley refused to stay the imposition of sanctions pending appeal. *Id.* at 9. Defendant thereafter obtained and produced the Credit Suisse documents. After that, her production obligations were presumptively satisfied. *See* Hafetz Aff., Ex. 75.

### III. Defendant's 2010-2015 Tax Returns

As referenced above, from 2004 to 2009, Defendant answered "no" to the Foreign Accounts Question. However, after Defendant received a grand jury subpoena, she did not check either a "yes" or "no" in response to the Foreign Accounts Question on her 2010 through 2015 returns. Rather, she wrote "See Attached Statement" and attached a "Disclosure Statement" stating: "In the context of an on-going federal criminal grand jury investigation being undertaken in the Southern District of New York, under the auspices of the United States Attorney's Office for that District, Lacy D. Doyle hereby asserts her rights and privileges under the Fifth Amendment not to incriminate herself by responding to [the Foreign Accounts Question]." Hafetz Aff., Ex. 3.

### IV. Procedural History

Following a discovery motion by Defendant, on December 22, 2016, the Government filed a letter requesting a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982) to address a potential conflict that Mr. Leibman might have in this matter. *See* Letter dated Dec. 22,

2016 (ECF No. 28). Specifically, the Government asserted, among other things, that Defendant may be able to assert an advice-of-counsel defense regarding some of the conduct at issue, and that defense counsel may be an unsworn witness at trial regarding certain filings made to the IRS. *Id.* In a January 10, 2017 letter, defense counsel opposed the Government's submission, and, on January 11, 2017, a hearing was held, after which Defendant was given an opportunity to consult with conflict-free counsel. *See* Letter dated Jan. 10, 2017 (ECF No. 30); *see also* Transcript (ECF No. 34). On April 6, 2017, Defendant moved to substitute her attorney, and this Court granted that request. *See* Motion to Substitute (ECF No. 40); *see also* Order Granting Leave for Withdrawal and Substitution of Attorney (ECF No. 41).

The Superseding Indictment was filed September 14, 2017, adding numerous new factual allegations, including that Defendant's withholding of documents that were required to be produced pursuant to subpoena and court order, from on or about March 28, 2014 through on or about June 1, 2017, was an act in furtherance of the conspiracy charged in Count One and the obstruction scheme charged in Count Two. Superseding Indictment ¶¶ 57-61, 72d. Further alleged is that Defendant did not respond to the foreign accounts question on her 2010-2015 tax returns. Superseding Indictment ¶¶ 64-65.

On October 30, 2017, Defendant filed the instant motion. *See* Motion (ECF No. 64); Memorandum of Law ("Def. Br.") (ECF No. 65). Defendant's motion seeks to preclude the Government from using her attempts to oppose the production of documents pursuant to the 2010 and 2016 subpoenas, and to strike references to that conduct from the Superseding Indictment. Her motion also seeks to suppress evidence obtained pursuant to the warrants authorizing the search of certain online accounts of which she is the accountholder. The government opposed Defendant's motion, and, by January, 11, 2018, the motion was fully briefed. *See* Memorandum

of Law in Opposition ("Gov't Br.") (ECF No. 70); Reply Memorandum ("Reply Br.") (ECF No. 74).

On February 9, 2018, the Court held a status conference. *See* Transcript (ECF No. 75). Addressing the portion of Defendant's motion raising suppression issues, the Court informed the parties that it anticipated that a short hearing addressing the good faith exception may be necessary before the Court could rule on the issue, in light of the dearth of information in the record regarding the warrant's execution. *Id.* at 2:17-20; 5:12-6:18. The Government indicated that it did not believe such a hearing was necessary, but elected to confer and submit letter briefs on the issue. *Id.* at 6:19-25.

Next, addressing Defendants' motion to strike surplusage from the indictment, the Court informed the parties that it does not typically read portions of the indictment to the jurors at trial. *Id.* at 8:21-9:10. The Court inquired as to whether, in light of the Court's practice, Defendant would still maintain her request to strike certain allegations from the indictment as surplusage, in the event the corresponding evidence were precluded. *Id.* Defense counsel indicated that, under those circumstances, Defendant's motion to strike would be rendered "academic." *Id.* at 9:11-19.

The Court has since received supplemental briefing from the parties on the question of good faith as well as additional matters related to the motion to suppress. That briefing, and portion of Defendants' motion, remains under consideration as of the date of this order, and will be resolved in a future order. The Court also sought and received supplemental letter briefing from the parties as to whether defense counsel's factual representations at the November 3, 2016 oral argument on their own would be admissible at trial under the Federal Rules of Evidence and the Fifth Amendment. *See* Order (ECF No. 77); Government's Letter Brief dated February 26, 2018

("Gov't Ltr. Br.") (ECF No. 79); Defendant's Letter Brief dated February 26, 2018 ("Def's Ltr. Br.") (ECF No. 80).

## DISCUSSION

### A. Legal Standards

#### 1. Motions *in Limine*

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 140 (S.D.N.Y. 2003) (citing *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984)). "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *Id.*

#### 2. Motion to Strike Portions of the Indictment

Upon a defendant's motion, the court "may strike surplusage from the indictment." Fed. R. Crim. P. 7(d). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (quoting *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)). Under this "exacting standard, only rarely is alleged surplusage stricken from an indictment." *United States v. Block*, No. 16-CR-595 (JPO), 2017 WL 1608905, at *5 (S.D.N.Y. Apr. 28, 2017) (citation omitted).

**B. Analysis**

The Fifth Amendment to the Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. More generally, the provision protects individuals against forced testimonial communications. *See Fisher v. United States*, 425 U.S. 391, 408 (1976). "The privilege thus permits a person to refuse to answer questions, in formal or informal proceedings, where the answers might be used to incriminate him in future criminal proceedings." *United States v. Okatan*, 728 F.3d 111, 116 (2d Cir. 2013) (quoting *United States v. Ramos*, 685 F.3d 120, 126 (2d Cir. 2012)).

As relevant here, "a taxpayer may, on his return, invoke his Fifth Amendment privilege selectively as to any particular item of information solicited[.]" *United States v. Josephberg*, 562 F.3d 478, 492 (2d Cir. 2009). It is similarly well-established that an individual may invoke the privilege in response to a grand jury subpoena. *See Fisher*, 425 U.S. at 410 ("The act of producing evidence in response to a subpoena [to a taxpayer] . . . has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It would also indicate the taxpayer's belief that the papers are those described in the subpoena."). However, the inquiry surrounding the scope of that privilege is often considerably nuanced. *See id.* ("These questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof."). Among these nuances, the "required records" doctrine negates the act of production privilege for "records required by law to be kept. . . ." *Shapiro v. United States*, 335 U.S. 1, 17 (1948).

Nonetheless, "for the privilege to be given full effect, individuals must not be forced to choose between making potentially incriminating statements and being penalized for refusing to

make them." *Okatan*, 728 F.3d at 116; *see Chavez v. Martinez*, 538 U.S. 760, 768-69 (2003) ("[N]o penalty may ever be imposed on someone who exercises his core Fifth Amendment right not to be a witness against himself in a criminal case.") (citation omitted). Thus, "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. United States*, 380 U.S. 609, 615 (1965).

### 1. *Defendant's Tax Returns*

First, Defendant seeks to preclude the Government's use of her answer to the Foreign Accounts Question on her 2010-2015 tax returns in its direct case. The Government intends to use this evidence to "demonstrate that the defendant never disclosed her foreign accounts to the IRS during that time period." Gov't Br. at 16-17. It proposes that the relevant line on Defendant's tax returns be redacted (and the attached rider excluded) to remove reference to her invocation of the privilege, and simply leave Defendant's answer to the Foreign Accounts Question blank. *Id.* at 17.

The Government argues that admission of this redacted document would not violate Defendant's Fifth Amendment rights because the Government is not attempting to argue "that the absence of an answer to the Foreign Account Question itself is substantive evidence of guilt." *Id.* Instead, the Government seeks to "prov[e] that the defendant never, in fact, disclosed her foreign accounts to the IRS." *Id.* This is, however, a distinction without a difference; as the government concedes, this proof is "required" to prove its case, since *"the essence of the charged scheme* is the defendant's hiding foreign bank accounts and income from the IRS from 2003 through 2017." *Id.* (emphasis added). This document is necessarily being used as substantive evidence of, among other things, a conspiracy to defraud the Government between the 2010 and 2015 tax years.

That the tax returns would be redacted is of no moment: the prosecution would be asking

the jury to infer guilt by use of this blank space, which, besides being incomplete and misleading,

is the documentary equivalent of the Defendant's silence. *See Salinas v. Texas*, 570 U.S. 178, 195

(2013) ("[T]o allow comment on silence *directly or indirectly* can compel an individual to act as

'a witness against himself'—very much what the Fifth Amendment forbids." (emphasis added)).[1]

Likewise, the parties' arguments that the jury might be misled with or without this evidence

are not pertinent. These contentions relate to relevance. The Government cites no case law

suggesting that such an argument trumps a Defendant's concededly valid invocation of her Fifth

Amendment privilege; rather, it is much to the contrary. *See, e.g., United States v. Carriles*, 832

F. Supp. 2d 699, 702-708 (W.D. Tex. 2010) (holding that Defendant's invocation of privilege was

inadmissible on Fifth Amendment grounds, then concluding, in dicta, that it was irrelevant, even

as substantive evidence of obstruction charge). As such, reference to Defendant's answer to the

Foreign Accounts Question on her 2010-2015 tax returns is precluded.

### 2. *Subpoena Litigation*

Defendant further seeks to preclude reference to her conduct during the subpoena litigation

pursuant to the Fifth Amendment and the Federal Rules of Evidence, arguing that the protracted

litigation included a number of Fifth Amendment objections and the jury's learning of those

arguments would violate her rights.

---

[1] The Government cites *United States v. Ezeh*, 92 F. App'x 834, 837 (2d Cir. 2004) for the proposition that prejudicial material is commonly redacted from otherwise relevant exhibits. Gov't Br. at 17. This is certainly true in the context of potential violations of *Bruton v. United States*, 391 U.S. 123, 126 (1968), as was the case in *Ezeh*. Here, where the Defendant's *own* statement (or silence) is at issue, it goes without saying that the stakes are different. But even if this were analogous to the *Bruton* context, "redactions are permissible so long as the redaction does not distort the statements' meaning, exclude substantially exculpatory information, or change the tenor of the utterance as a whole." *Ezeh*, 92 F. App'x at 837 (citation omitted). Here, the proposed redaction would drastically alter the meaning of the exhibit.

In light of the multifaceted nature of the subpoena litigation, it is first necessary to break down the analysis into the discrete stages that comprise the subpoena litigation, and then the nature of evidence sought to be admitted within each stage. The first stage of the litigation, spanning from 2010 to 2013, concerned Defendant's obligation to produce documents pursuant to the required records exception to the Fifth Amendment. This stage ended when the Defendant abandoned her appeal to the Second Circuit. The Government does not seek to admit this conduct.

The second stage of the litigation involved the following: *first*, Defendant's 2014 production of records in response to the 2010 Subpoena (as a result of her dropping her appeal), *second*, a significant gap of time during which the Government proceeded to build its case, only to realize Defendant's production may have been incomplete; and, *third*, the Government's attempts to follow up with Defendant regarding her incomplete production, ultimately leading to the November 3, 2016 hearing and January 24, 2017 civil contempt ruling by Judge Pauley. The Government seeks to admit the entirety of this conduct, including allegedly false statements at the hearing by Defendant's then-attorney.

The third stage of the litigation concerned a sequence of proceedings attempting to purge Judge Pauley's January 24, 2017 contempt order. During this time, Defendant actively sought to comply with the subpoena by requesting the necessary bank records. This period included an adjudication from Judge Pauley as to whether Credit Suisse's insistence on removal of reference to the compelled nature of Defendant's directive violated Defendant's Fifth Amendment rights. At no time during this period were contempt sanctions imposed. By June 1, 2017, Defendant was presumptively in full compliance with the subpoena.

The Government seeks to admit evidence from the second and third stages of the subpoena litigation to demonstrate "that the defendant unlawfully withheld documents" from the grand jury

during the second and third stages of the subpoena litigation, but not that defendant "unsuccessfully tried to invoke the Fifth Amendment as a ground for withholding documents from the grand jury." Gov't Br. at 19.

To demonstrate this "unlawful[]" conduct, the Government apparently seeks to present the legal arguments that counsel made during those periods, in order to argue to the jury that Defendant's continued withholding of documents constituted unlawful and obstructive behavior because defense counsel's legal arguments were "frivolous and in bad faith." Gov't Br at 22; *see* Gov't Br. at 19-23 (arguing that counsel's legal arguments at various stages of the litigation constituted unlawful conduct). In addition, the Government intends to admit defense counsel's allegedly "false and misleading statements" to the Court at the November 3, 2016 conference. Gov't Br. at 23-24. As to both categories of evidence, the Government reasons that precluding this evidence on the basis that Defendant was acting in good faith upon advice of counsel would improperly usurp the jury's role as factfinder. *Id.* at 19-20.

Although the Court will address the legal arguments and the factual representations separately (as they present different issues), the Court nonetheless reaches the same outcome as to both, concluding that each category of evidence must be precluded.

The parties do not dispute that the 2010 "required records" issue was raised in good faith and resolved when Defendant dropped her appeal.  Rather, their dispute centers upon whether the subsequent legal arguments attempting to hone Defendant's production obligations under the subpoena can be presented to the jury as substantive evidence of guilt.  Most critically, unlike Defendant's tax returns, here it is beyond cavil that Defendant's objections were ultimately deemed invalid; the question is the degree to which they actually involved a good-faith assertion of the Fifth Amendment privilege, and whether such reference must be precluded under the Fifth Amendment or the Federal Rules of Evidence.

At first glance, the distinction the Government attempts to draw between merely presenting evidence that Defendant's conduct was "unlawful" and the jury learning of the Defendant's invocation of the privilege appears, again, to be a distinction without a difference.  At each stage of the 2014-2017 subpoena litigation, Defendant raised some iteration of a Fifth Amendment objection and it seems inevitable that to show her conduct was "unlawful" some reference will have to be made to the legal arguments – including those asserted pursuant to the Fifth Amendment – that rendered the conduct "unlawful."  The Government justifies this by arguing that any invocation of the privilege was invoked in bad faith, thus rendering Defendant's acts unlawful. Gov't Br. at 22.  They assert that Defendant's Fifth Amendment objection was fully resolved in 2014. Gov't Br. at 26.  However, as the record and the Government's own submission betray, the parties continued litigating the scope of the subpoena, as well as the Defendant's Fifth Amendment privilege with respect to it, until mid-2017, when Defendant ultimately complied with the subpoena.  Gov't Br at 24-25; *see, e.g.*, Hafetz Aff., Ex. 36 at 6, 17 (Judge Pauley's January 24, 2017 decision discussing Defendant's objection on the ground that foreign documents were not in

her "care, custody, or control" and rejecting additional Fifth Amendment argument asserted by Defendant); *id.* Ex. 65 at 7-8 (Judge Pauley's April 3, 2017 decision addressing Defendant's new Fifth Amendment objection to Credit Suisse directive). Though the initial required records objection was resolved when Defendant dropped her appeal, Defendant's arguments proceeded to take different forms in the subsequent contempt proceedings, but reference to the Fifth Amendment was pervasive throughout. Thus, even assuming a "bad faith" withholding of such documents suffices to be "unlawful," the Government does not articulate how it intends to demonstrate Defendant "unlawfully withheld documents" without reference to the subpoena litigation and Defendant's initial, concededly proper assertion of the privilege therein; to the contrary, it appears it will require exactly that. However phrased, it will be unacceptably costly. *See Okatan*, 728 F.3d at 119 ("Use of a defendant's invocation of the privilege imposes the same cost no matter the context in which that invocation is made.").

Even setting aside the prejudicial nature of the mini-trial that would result,[2] the Government cites no authority for the proposition that evidence of protracted litigation over a Defendant's Fifth Amendment objection to a grand jury subpoena (at the conclusion of which Defendant entirely complied) is, as a general matter, admissible as evidence of an obstruction offense or the like in the Government's case-in-chief. Again, the opposite seems to be true. *See, e.g.*, *United States v. Sasser*, 974 F.2d 1544, 1558-59 (10th Cir. 1992) (suggesting that evidence of non-compliance with subpoena inadmissible on Fifth Amendment grounds); *cf. United States v. Rice*, 52 F.3d 843, 846 (10th Cir. 1995) (holding it was not plain error for district court to allow

---

[2] For many of the same reasons set forth in the next section of this opinion, the Court concludes that, even if the admission of counsel's legal arguments during the 2014-2017 subpoena litigation would not violate the Fifth Amendment, such arguments must be precluded under the Federal Rules of Evidence. The rationales for preclusion of defense counsel's factual averments, as discussed in greater depth below, apply with even greater force to defense counsel's legal arguments.

prosecutor to present evidence of improper invocation of the Fifth Amendment privilege where Defendant pursued theory that put his invocation at issue).

Of course, a spectrum exists between good and bad faith assertions of the privilege, and, at some point on that spectrum, litigation conduct undertaken with sufficient bad faith may give rise to an obstruction or other criminal charge. *Compare Maness v. Meyers*, 419 U.S. 449, 469 (1975) (discussing parties' advocacy and commendable litigation conduct as demonstrating good faith conduct, unable to support a charge), *with United States v. Cioffi*, 493 F.2d 1111, 1119 (2d Cir. 1974) (distinguishing threats and intimidation from "mere giving of advice"). But the thumb is very much on the good faith side of the scale. Because a defendant is not required to substantiate her initial assertion of the privilege, neither the abrogation of the privilege, nor, by extension, a finding of bad faith and a resulting prosecution can possibly occur until a judge concludes that "it is *perfectly clear*, from a careful consideration of all the circumstances in the case, that the [defendant's assertion] is mistaken, and that the answers *cannot possibly* have such tendency to incriminate." *See Malloy v. Hogan*, 378 U.S. 1, 12 (1964) (emphasis added) (quoting *Hoffman v. United States*, 341 U.S. 479, 488 (1951)). Only then does Defendant assume the "burden of establishing a foundation for the assertion of the privilege." *In re Morganroth*, 718 F.2d 161, 169 (6th Cir. 1983) (citing, *inter alia*, *United States v. Rosen*, 174 F.2d 187, 188 (2d Cir. 1949)). And, where a defense lawyer's legal advocacy during that process is the basis for the charged scheme, the bar is seemingly even higher. *See United States v. Cueto*, 151 F.3d 620, 631-32 (7th Cir. 1998) (in prosecution of defense lawyer for conspiracy and obstruction of justice, distinguishing lawyer's mere advocacy for "his client's interests *within the scope of the law*" from evidence of a "corrupt endeavor to influence the due administration of justice," as demonstrated by lawyer's personal financial interest).

Here, a more granular review of the record before the Court does not reveal bad faith on the part of Defendant or her attorney. The parties engaged in extensive motion practice related to the scope of Defendant's document production over a multi-year period. The first phase of the litigation involved an issue of first impression within the Circuit. *See In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d at 347 (joining other circuits in holding that required records exception applies to records kept pursuant to Bank Secrecy Act). And, both in 2014 and 2016, counsel made clear that he was continuing to dispute the Bank Secrecy Act's application to his client specifically. Although Judge Pauley's 2013 order had already briefly touched upon this issue and had seemingly resolved it against Defendant, the cover letter presented with Defendant's initial production reserved her rights as to it. Then, the Government did not follow up to contest the objection or otherwise enforce the subpoena until two years later. Indeed, as Judge Pauley noted, a good portion of the litigation delay that followed was not attributable to Defendant. *See* Hafetz Aff., Ex. 36 at 17 ("When this Court pressed the Government on the reason why, more than three and a half years later, it did not enforce the sanctions provision, its response was underwhelming.").

The litigation that then followed was contentious, and the legal arguments presented required extensive oral argument, as well as Judge Pauley's careful consideration and the production of detailed and sometimes lengthy opinions. As such, it is difficult to conclude that these legal arguments were "frivolous." The motions presented new issues in each instance, and as the litigation progressed, more documents, as well as a follow-up subpoena, were generated and the factual circumstances evolved, resulting in further objections and motions seeking compliance. Each motion, although not concerning the initial required records objection that Defendant had raised, involved some form of an objection that implicated Defendant's purported Fifth

Amendment rights. In the initial stage of the 2016-2017 litigation, the most pertinent objection was the extent to which Defendant merely had to possess, as opposed to seek out, records to comply with Section 1010.420, pursuant to the subpoena. The subpoena's reference to Section 1010.420 would not be necessary but for the Fifth Amendment and the required records exception. While Defendant's objection was ostensibly resolved by Judge Pauley in a short paragraph of his 2014 opinion, defense counsel in good faith did not appear to believe so, and the Government did nothing to correct that belief in response to the reservations that counsel had asserted, even despite its awareness of the possibility of having to file a second motion to compel. Hafetz Aff., Ex. 10 at 14. In addition, because Defendant had been indicted between her initial production and the 2016 litigation before Judge Pauley, Defendant raised an additional Fifth Amendment objection on the basis that enforcing the grand jury subpoena, following her indictment, would violate her trial rights. Although Judge Pauley rejected this argument, it required multiple pages of his opinion to address, and at no point did Judge Pauley indicate it was raised in bad faith. On this basis, the Court cannot conclude that the numerous legal arguments asserted by defense counsel which culminated in Judge Pauley's January 24, 2017 Order were asserted in bad faith.[3]

The same goes for the arguments that Defendant subsequently asserted between January and June of 2017, which predominantly concerned at Defendant's ability to properly conform the language of her directives to banks to preserve her assertion of the privilege, an entirely valid concern given the pending indictment. Again, the opinions that followed, though rejecting these arguments, did not label them as asserted in bad faith, or otherwise imply the same.

---

[3] Although not dispositive of this issue, the Court observes that the Government did not attempt to amend the indictment to allege this obstructive conduct until nearly one year later, on September 14, 2017. In its December 22, 2016 letter to this Court requesting a *Curcio* hearing, the Government did not allude to an intent to supersede the indictment to include Mr. Leibman's arguments, or otherwise suggest that Mr. Leibman's legal arguments and factual averments were asserted in bad faith. To be sure, Judge Pauley did not issue a ruling on Defendant's objections until approximately one month later, but even after that point, the Government did not raise this issue.

To be sure, Judge Pauley did, at certain points, describe Defendant's conduct as "contumacious" and issue certain findings of non-compliance (sometimes for the purpose of enabling appellate review). *E.g.*, *id.* at 18. However, despite mentioning Defendant's "good faith" obligations to produce documents on at least two occasions, Judge Pauley never concluded that Defendant's legal arguments attempting to narrow the scope of that obligation were asserted in "bad faith," nor is any bad faith apparent to the undersigned. *See, e.g.*, *United States v. Remini*, 967 F.2d 754, 760 (2d Cir. 1992) (acknowledging, in context of guidelines analysis, that even *criminally* contemptuous conduct only sometimes requires bad faith). At the litigation's conclusion, Judge Pauley complimented defense counsel as "competent, experienced, and sophisticated."

Only at that point in 2017 was it "perfectly clear" that Defendant's Fifth Amendment objections were overruled. *Malloy*, 378 U.S. at 12. Defendant was then obligated to complete the production or suffer further sanction, and she chose to produce the requisite documents without meaningful delay. Thus, the Government has failed to demonstrate bad faith, nor how it might present these arguments as unlawfully asserted without delving into their merits (*i.e.*, the overruled assertion of the Fifth Amendment privilege).

For the reasons stated above, the Court concludes that Defendant's legal arguments during the subpoena litigation are inadmissible as evidence of the charged offenses.

### b.    *Defense Counsel's Factual Representations*

A question remains, though, as to whether counsel's allegedly false statements at the November 3, 2016 hearing before Judge Pauley may be excised from the legal arguments and admitted as affirmative evidence of obstructive conduct. Specifically, defense counsel made two categories of factual representations at the hearing that the Government now claims were

misrepresentations: *first*, that Defendant and/or the Gestino Foundation *did not* possess, and never possessed, responsive records (*see* Hafetz Aff., Ex. 35 at 19:21-25 (arguing that because Defendant was a "discretionary beneficiary, not the sole beneficiary[,]" "[w]e have no [Gestino Foundation] records, didn't then, don't now. We don't know where the account is located. My client is a discretionary beneficiary, not the sole beneficiary . . . So we don't know where it is."); *id.* at 17:19-20 (stating that Gestino did "not have any responsive records.")); and, *second*, that Defendant *could not* produce responsive records (*id.* at 20:22-24 (arguing that "[Judge Pauley's] sanctions will have no effect. One cannot produce what one doesn't have. My client would have to fabricate records in the basement in order to comply with an order. . . ." )).

Defendant contends, citing no authority, that she will have no choice but to call defense counsel to explain what his client told him as well as his mental state and legal strategy, which will necessarily and impermissibly require the jury to learn of her invocation of the Fifth Amendment privilege. Def's Ltr. Br. at 2-4. However, the Fifth Amendment is not implicated simply because the Defendant feels she has to put on a defense to respond to the prosecutor's evidence.[4] This, in part, distinguishes the alleged factual misrepresentations from the legal arguments discussed above – the legal arguments necessarily require presentation of Defendant's invocation of the privilege on the government's case, while the factual misrepresentations, stripped

---

[4] *See United States v. Brandon*, 50 F.3d 464, 469 (7th Cir. 1995) (holding that admission of statement by attorney in response to subpoena to the effect that defendant had no responsive records "did not force [Defendant] to take the stand" and therefore did not "impair[] his privilege against self-incrimination"); *United States v. Shively*, 715 F.2d 260, 268 (7th Cir. 1983) ("Circumstances—a cogent prosecution witness, or a codefendant who is trying to exculpate himself at the defendant's expense—often force a defendant to take the stand in his own defense; yet there is no infringement of the Fifth Amendment."); *United States v. Weber*, 437 F.2d 327, 335 (3d Cir. 1970) ("That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been though an invasion of the privilege against compelled self-incrimination.") (quoting *Williams v. Florida*, 399 U.S. 78, 83-84 (1970)); *United States v. Zemke*, 457 F.2d 110, 115 (7th Cir. 1972) (holding that the prosecution's presentation of strong evidence of guilt does not "compel" the defendant to testify in violation of the Fifth Amendment); *United States v. Lockhart*, No. 4:17-CR-02-1, 2017 WL 3471430, at *3 (E.D. Va. Aug. 11, 2017) (concluding that former defense lawyer's testimony regarding allegedly obstructive communications by defendant did not impact Defendant's right to remain silent at his trial because "testimony by a defendant's lawyer would not compel the defendant to do anything and certainly would not compel him to be a witness against himself.").

of their context, do not. Defendant may so choose to present her former lawyer's testimony as part of her own case, but her doing so would not violate her Fifth Amendment rights.[5]

Defendant vaguely suggests, again citing no authority, that the fact that she did not personally utter the false statements and was not personally present at this argument is "dispositive" of the statements' admissibility. Def's Ltr. Br. at 1 & Ex. 1 (Defendant's declaration indicating she was not present at the November 3 argument). The Court construes this objection as a hearsay objection, and addresses it as follows.

Under Federal Rule of Evidence 801(d)(2), a statement is not hearsay if it "was made by a person whom the party authorized to make a statement on the subject" or "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(C) & (D). The latter circumstance – codified at subsection (D) – "expand[ed] admissibility beyond the common law rule" (reflected at subsection (C)) to render a Defendant's express authorization of a statement unnecessary to its admissibility. *United States v. Vito*, No. CRIM. 88-137, 1988 WL 78031, at *2 (E.D. Pa. July 22, 1988). "'Once agency, and the making of the statement while the relationship continues, are established, the statement is exempt from the hearsay rule so long as it relates to a matter within the scope of the agency.'" *Id.* (quoting 4 Weinstein's Evidence 801–221 to –222).

Naturally, an attorney's statements "concerning a matter within his employment may be admissible against the party retaining an attorney." *United States v. Margiotta*, 662 F.2d 131, 142 (2d Cir. 1981). Contrary to Defendant's contention, therefore, the case law imposes no absolute requirement that Defendant be present when her attorney utters the statement at issue. However,

---

[5] Additionally, because neither party suggests that Defendant's statement is tantamount to a confession, this is not a case where the Government's proposed evidence would tell an incomplete or distorted account of the facts, thereby forcing the Defendant to take the stand. *E.g.*, *United States v. Marin*, 669 F.2d 73, 85 & n.6 (2d Cir. 1982). Defendant does not argue otherwise.

as the Government points out, the inquiry that courts have typically undertaken in the attorney-client context is, in practice, far more nuanced than merely determining the existence of an agency relationship. A brief discussion of that case law, with has emerged most substantially from within this Circuit, is warranted.

The seminal case in this area is *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), which concerned the "evidentiary use against a criminal defendant of an attorney's seemingly inconsistent statement at an earlier trial to prove that fundamental portions of the defendant's present case are fabricated." *Id.* at 30. After holding that "prior opening statements are not *per se* inadmissible in criminal cases[,]" the Court went on to discuss at length the party admission rule's "anomal[ousness]." *Id.* at 31-32. Because "[a]dmissions may . . . be used even though the statement was plainly self-serving when made, was not based upon the personal knowledge of the speaker and is in a form which would otherwise be admissible," the Court recognized that the party admission rule "is in some respects an exception to the general proposition that probative value and reliability are the touchstone of the law of evidence where non-privileged matters are concerned." *Id.* at 32.

As such, the *McKeon* Court announced five "important polic[y]" considerations for district courts to consider in determining whether "evidentiary use of prior jury argument must be circumscribed" –

> (1) whether the use of the prior argument would "consume substantial time to pursue marginal matters";
> (2) whether the prior argument must be excluded to avoid the drawing of unfair inferences (e.g., whether the jury might be "misled as to the government's obligation to prove all the elements at both trials");
> (3) whether the use of the prior argument would "deter counsel from vigorous and legitimate advocacy";
> (4) whether "an innocent factual explanation of a seeming inconsistency created by the prior opening statement exists," such

that the "offer of that explanation may seriously affect other rights of the defense"; and

(5) whether the admission of the prior argument necessarily leads to disqualification of defendant's chosen counsel, "a most serious consequence."

*Id.* at 32-33.

Among other things, the Court emphasized that the "inconsistency . . . should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial." *Id.* at 33. It further noted that, in determining whether a sufficient agency relationship exists to bind the Defendant, "[t]he formal relationship of the lawyer as agent and the client will rarely suffice" because inherent in the attorney-client relationship is "considerable delegation" which "tends to drain the evidentiary value from such statements." *Id.* Thus, "some participatory role of the client must be evident, either directly or inferentially as when the argument is a direct assertion of fact which in all probability had to have been confirmed by the defendant." *Id.* At the conclusion of this discussion, the Court of Appeals mandated that the district court conduct a hearing in such scenarios in order to "determine by a preponderance of the evidence that the inference the prosecution seeks to draw from the inconsistency is a fair one and that an innocent explanation for the inconsistency does not exist." *Id.*

However, the Government argues, correctly, that the Court of Appeals has subsequently limited *McKeon* balancing to the context of prior jury arguments, rather than all statements by defense counsel. Gov't Ltr. Br. at 3 (citing *United States v. Amato*, 356 F.3d 216 (2d Cir. 2004); *United States v. Arrington*, 867 F.2d 122 (2d Cir. 1989)). Thus, the Government argues, where false statements are made in the course of an attorney's representation of Defendant, and in furtherance of charged conduct, they are admissible as statements of an opposing party. *Id.* at 2-3.

However, it is not clear that the necessary inquiry is so simple. For example, in *Amato*, despite recognizing this limitation, the Court proceeded to analyze the use of the prior statements, which were not prior jury arguments, in light of the *McKeon* factors. *See Amato*, 356 F.3d at 219-20 (analyzing counsel's alleged factual misrepresentations in letter supporting bail applications under *McKeon* factors before determining that "[i]t is abundantly clear that the admissibility of the . . . letter is not governed by McKeon but rather by the Federal Rules of Evidence.") (citing Fed. R. Evid. § 801(d)(2)(D)). Similarly, in *Arrington*, despite formally disavowing the "special procedures" endorsed in *McKeon*, the Court discussed *United States v. Valencia*, 826 F.2d 169 (2d Cir. 1987), at length, suggesting that, in *Valencia*, the Court analyzed a defense attorney's out-of-court statements to a prosecutor in the context of plead negotiations "under 801(d)(2), and not under special procedures that the defendant contends were established in . . . *McKeon*." *Arrington*, 867 F.2d at 127-28.

To the contrary, however, in a 2-1 decision, the *Valencia* majority discussed *McKeon* in great detail before affirming a district court's decision to exclude those statements. The *Valencia* Court followed *McKeon* to the extent that it acknowledged *McKeon*'s careful "canvassing [of] the precise circumstances of the case" to determine the admissibility of the attorney's statements, and then proceeded to do the same. *Valencia*, 826 F.2d at 173. The Court further emphasized that the degree of care employed in *McKeon* was necessary because of a broader "concern" that the "routine use of attorney statements against a criminal defendant risks impairment of the privilege against self-incrimination, the right to counsel of one's choice, and the right to effective assistance of counsel." *Id.* The *Valencia* Court's analysis thus accounted for whether the prior statements were reliable (*i.e.*, the fact that they were not transcribed, unlike an opening statement at trial), whether their admission would encroach on certain policy concerns (*i.e.*, the prospects for plea

negotiations), and the utility of the prior statements at the subsequent trial (*i.e.*, the degree of contradiction and the importance of that evidence to the government's case). *Id.*; *see id.* at 174-77 (Meskill, J., dissenting) (applying *McKeon* factors to come to opposite conclusion). The Court then reiterated that, in the context of an 801(d)(2) analysis:

> We recognized in *McKeon* that a district judge must be sensitive to competing concerns in deciding whether to admit attorney statements against a client accused of crime. In the context of some evidentiary issues, we have recognized that 'the trial judge is in the best position to weigh competing interests in deciding whether or not to admit certain evidence.' Though some provisions of the Federal Rules of Evidence are precise, permitting little, if any, room for the exercise of trial court discretion in their application, we think the trial judge must be accorded considerable discretion in determining the application of Rule 801(d)(2) to statements of an attorney offered by the prosecutor against a criminal defendant.

*Id.* (quotations omitted); *accord United States v. Jung*, 473 F.3d 837, 841-42 (7th Cir. 2007) (applying "'more exacting standard [that] the must demanded for admission of statements by attorneys under Rule 801(d)(2)(D)'") (citing *United States v. Harris*, 914 F.2d 927, 931 (7th Cir. 1990) (adopting rationale of *McKeon* outside of prior jury argument context)); *United States v. Wells*, No. CRIM. 94-0191-R, 1994 WL 421471, at *11 (S.D. Cal. July 5, 1994) (declining to apply "agency law formalistically" to lawyer's factual representations in written brief, reasoning that, under *McKeon*, "Court must decide for itself whether the statements made by the attorneys can be attributed to [Defendant] as if they were his own testimony").

As such, the Court extracts from these opinions that, though the specialized hearing and heightened scrutiny suggested by *McKeon* is not strictly required here, many of the concerns discussed in *McKeon* necessarily animate a court's "sensitive" analysis under Rules 403 and 801(d)(2)(D). *See Arrington*, 867 F.2d at 127-28 (citing to *Valencia* as example of necessary inquiry). For example, the first *McKeon* factor – whether the use of the prior argument would "consume substantial time to pursue marginal matters" – is exactly the analysis that would

otherwise be required under Rule 403. *See id.* (providing that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). It is therefore apparent that many of the *McKeon* factors, though specifically tailored to the context of a prior jury argument, are grounded in the more general concern that the *McKeon* Court espoused about the party admission rule becoming "an exception to the general proposition that probative value and reliability are the touchstone of the law of evidence where non-privileged matters are concerned." 738 F.2d at 32. Thus, the Court necessarily takes the *McKeon* factors into account, where applicable, as it proceeds to assess the objections that Defendant has raised regarding their reliability and relevance. Deploying any less vigilance would abdicate the Court's duty to protect the interests in fundamental fairness, protection of the community, and truth-seeking that characterize our judicial process. *See, e.g., United States v. Gigante*, 971 F. Supp. 755, 756-57. (E.D.N.Y. 1997) (suggesting that "American criminal procedure . . . is pragmatic[,]" designed to find the most "ideal condition" that enables "an effective search for the truth" while "protecting the defendant's need for fairness and due process and the public's right to protection against crime.") (citing *Maryland v. Craig*, 497 U.S. 836, 850 (1990)).

After a careful weighing of these considerations, the Court is not satisfied that the admission of these statements does not run afoul of the pertinent Federal Rules of Evidence and the policies undergirding them, and exercises its discretion to exclude them.

The Government argues that these statements are admissible because they are "clear and ambiguous assertions of fact that were made in a court proceeding and transcribed by a court reporter[,]" occurred as part of a "long-running civil contempt and sanctions dispute[,]" and are

being "offered as direct evidence of the charged conduct." *See* Gov't Ltr. Br. at 3 (contrasting this case to *Valencia*). Defendant contends that these statements cannot reliably be attributed to her because, among other things, she was not present at the conference at which her counsel uttered them. Def's Ltr. Br. at 1.

As an initial matter, the parties do not dispute that, at the time the statements were made, defense counsel was acting as Defendant's representative in the ongoing contempt proceedings, as well as in the criminal matter, which had been pending approximately four months before defense counsel made these statements. In any event, some cases have, in fact, suggested that the Government's use of former defense counsel's prior factual representations, even when transcribed, should not be admitted to prove an element of a criminal charge, at least where defense counsel was, in the prior proceeding, under "some degree of compulsion and outside the presence of his client[.]" *United States v. Freeman*, 519 F.2d 67, 70 (9th Cir. 1975). *Freeman* involved a conviction after trial for "bail jumping" based on Defendant's failure to appear for her sentencing in a previous case. *Id.* at 68. The Government called Defendant's attorney at the bail jumping trial to provide evidence of notice (*i.e.*, that Defendant knew she was required to appear at her sentencing, which counsel had previously represented to the court as part of those proceedings). *Id.* The Ninth Circuit concluded that counsel's testimony was inadmissible hearsay, reasoning that, "[w]hile an attorney's considered, across-the-bench representations to the court are presumably trustworthy, such statements are made neither under oath nor subject to cross-examination." *Id.* at 70. Further, the attorney likely "perceive[d] some compulsion" to respond, as an officer of the court, to the Court's inquiries regarding his client, which rendered his interests "in conflict with the interests of his absent client." *Id.* The Court concluded by reasoning that "[w]ere we to hold otherwise in the absence of evidence of appellant's express authorization to her

counsel to make the representations, we might well be ratifying a violation of her privilege against self-incrimination or other substantial rights." *Id.* (citations omitted).

Only some of the concerns espoused in *Freeman* exist here. Like the Defendant in *Freeman*, this Defendant was not present at the prior proceedings. Nor was counsel testifying under oath as part of an evidentiary hearing, subject to cross-examination. That said, Defendant did nothing to correct these statements after the fact, presumably because she maintained then, as she maintains now, that they were factually accurate. Thus, there is no reason to believe she did not consent to these statements being made, or their accuracy when learning of them after the fact. *See United States v. Painter*, No. CRIM.A. 12-87-JJB, 2013 WL 6097554, at *2 (M.D. La. Nov. 20, 2013) (declining to admit attorney's statements where, among other things, "they were submitted without the Defendant's review or consent"). This gravitates in favor of the statements' reliability, but against their probative value, given that their value lies in their purported falsity, as discussed further below. Nor were these statements compelled in the sense that they were in *Freeman*: while these matters were asserted as part of counsel's zealous efforts at avoiding a finding of civil contempt, this was not a situation where counsel's interests were misaligned with his client's, thus undercutting the reliability of counsel's factual averments.

In that regard, while these statements are not as directly inculpatory as those at issue in *Freeman*, it was, or at least should have been, apparent to counsel and the Court, given the charges pending at the time, that any factual misrepresentations might be used against Defendant in her pending obstruction case. *See United States v. Martin*, 773 F.2d 579, 583 (4th Cir. 1985) (suggesting that "an attorney's admission of criminal liability might not be admissible against the client" under hearsay rule) (citing C. McCormick, Evidence § 267 at 643–44 (2d ed. 1972)); *see also* Hafetz Aff., Ex. 33 at 31 (suggesting that these arguments were improperly before Judge

Pauley in light of pending parallel criminal case). In other words, while counsel's knowledge of the pending charges cuts in favor of the reliability of his statements, it at the same time cuts against using those statements against her. *See Wells*, 1994 WL 421471, at *11 (declining to admit lawyer's statement in written brief because "[n]othing suggest[ed] that [Defendant] approved or even saw the . . . brief. [Defendant] can hardly be faulted for his attorneys' failure to foresee the possibility that the tools of their advocacy might later be used against [Defendant] in criminal proceedings filed almost one year later."). The stakes at the time were high, and, as discussed above, counsel was reasonably of the mindset that Defendant was asserting a valid Fifth Amendment objection, which the Court had not yet fully resolved.

This context is not lost on the Court here. Most applicable here, in *Margiotta*, the Court of Appeals held that a district judge did not abuse his discretion in excluding an attorney's statements in a memorandum to persuade the Department of Justice that his client (the Defendant) should not be indicted, which were inconsistent with the Defendant's trial testimony, but also a component of an interview with Government attorneys pursuant to an immunity agreement. 662 F.2d at 142-43. The Court found that those statements were properly excluded because they were encompassed within Defendant's immunity agreement, and that Defendant had not waived his rights either expressly or by implication. *Id.* at 143. The Court emphasized the presumption against the waiver of constitutional rights and the necessity of "an intentional relinquishment or abandonment of a known right or privilege" in drawing this conclusion. *Id.* (citing, *inter alia*, *Glasser v. United States*, 315 U.S. 60, 70-71 (1942)).

As discussed at greater length above, the admission of counsel's representations in this case – and Defendant's claimed need to rebut them – does not impair Defendant's Fifth Amendment rights, and does not, by extension, require a waiver of those rights in the *Margiotta*

sense. *See Harris*, 914 F.2d at 931 ("Harris' rights under the fifth amendment were burdened by allowing this testimony only to the extent that any damaging piece of evidence generally forces a defendant to present a competing explanation to the jury. This does not, however, violate the privilege against self-incrimination."). Nonetheless, admitting counsel's statements in this context may cause "defendants [to] be chilled from sharing information with their attorneys, defense attorneys [to] be deterred from vigorous advocacy, and the attorney-client relationship [to] be impaired . . . ." *Jung*, 473 F.3d at 842; *Accord McKeon*, 738 F.2d at 33; *see* Margareth Etienne, *Remorse, Responsibility, and Regulating Advocacy: Making Defendants Pay for the Sins of Their Lawyers*, 78 N.Y.U. L. Rev. 2103, 2163 (2003) ("Even if there were a perfect agency relationship between criminal defense lawyers and their clients, however, reliance on it [at sentencing] to penalize defendants would still be improvident."). In the same way that the *Margiotta* Court undoubtedly considered the possibility of deterring Defendants from entering into immunity agreements, this Court is reluctant to take any action that might deter the most vigorous assertions of a Defendant's other rights under the Fifth Amendment, even when erroneously asserted in good faith, and, just as if not more importantly, the attorney-client communications necessary for those arguments to flourish.

This is not, of course, to lose sight of the general truth-finding purpose of the Federal Rules of Evidence, *see* Fed. R. Evid. 102, and the concomitant rule that all relevant evidence is generally admissible. Fed. R. Evid. 402. However, Defendant further disputes the Government's assertion that, because these statements were false, they are relevant as "direct evidence of" the charged "acts of obstruction." Defendant claims that her counsel's statements were, in fact, true, and thus not relevant or probative, because counsel was merely asserting that Defendant did not have "responsive" records, *i.e.*, documents in her physical possession, which Defendant deemed to be

the scope of her compliance obligation under her Fifth Amendment privilege. Def's Ltr. Br. at 3. This is one of a few ways Defendant ably explains away the representations regarding what Defendant had as not, in fact, false. However, Defendant hardly accounts for her attorney's representations to the effect that Defendant *could* not produce records from Gestino, and would have to fabricate records to comply, dedicating only one unpersuasive sentence to them in her letter brief. Def's Ltr. Br. at 3. Nor can she, because her near-immediate production of records in response to Judge Pauley's order appears to demonstrate the falsity of this statement.

That said, proof of obstruction in this context requires both an act of obstruction and corrupt intent. *See* 26 U.S.C. § 7212(a). Conspiracy to defraud the United States through subscribing a false tax return similarly requires a willful mental state. *See* 18 U.S.C. § 371; 26 U.S.C. § 7206(1); *see also, e.g.*, *United States v. Feola*, 420 U.S. 671, 686 (1975) (holding that "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself.") (citation omitted). Thus, even if these statements were as demonstrably false as the Government asserts so as to be probative of an obstructive act (or an act in furtherance of a tax fraud conspiracy), they are less probative of corrupt or willful intent, because Defendant was not present and did not utter them herself. *See, e.g., United States v. Kaplan*, 490 F.3d 110, 121 (2d Cir. 2007) (suggesting that testimony is less probative of knowledge or intent, and much more likely to have a prejudicial effect, where it requires a number of logical leaps to reach that conclusion) (citing *United States v. Ravich*, 421 F.2d 1196, 1204 n. 10 (2d Cir. 1970) (Friendly, J.)); *see also* Gary S. Humble, *Evidentiary Admissions of Defense Counsel in Federal Criminal Cases*, 24 Am. Crim. L. Rev. 93, 121 (1986) (discussing how a lawyer's fundamental purpose is "to point out the inferences or interpretations of facts which are most favorable to his client; therefore, the admission may have

little probative value and may be considered unreliable."). As such, these statements appear to be marginally probative of the conspiracy and obstruction charges, though to differing extents.

It should also be noted that the availability of evidentiary alternatives undercuts this evidence's probative value to a certain degree. *See, e.g., Old Chief v. United States*, 519 U.S. 172, 184 (1997) (discussing propriety of considering evidentiary alternatives in 403 balancing). The Superseding Indictment contains no shortage of other allegedly obstructive conduct. As discussed above, Defendant's lawyer's conduct was only included upon the filing of a superseding indictment, undercutting its importance to the Government's case, to some extent, as to the obstruction charge (which appeared in the original indictment). Indeed, at the outset, the core conduct underlying the obstruction charge was Defendant's tax filings, and it may be that the subpoena litigation conduct was added to cure a potential statute-of-limitations problem with the original charges, thus rendering the subpoena litigation evidence perhaps more essential to the Government's case. While this cuts in favor of the Government to some extent, the law in this area is very permissive, and other allegations in the indictment do appear to come within the statute of limitations. *See United States v. Levine*, 249 F. Supp. 3d 732, 735-37 (S.D.N.Y. 2017).

Additionally, the Court would be remiss if it failed to acknowledge the potentially heightened importance of Defendant's subpoena litigation conduct to the Government's case following the Supreme Court's decision in *Marinello v. United States*, No. 16-1144, 2018 WL 1402426 (U.S. Mar. 21, 2018), which held that, for the purposes of the obstruction statute, the Government must demonstrate a nexus between the defendant's conduct and a pending, or reasonably foreseeable, administrative proceeding. *Id.* at *7-*8. The Court is reluctant to wade into an issue that the parties have not yet been able to brief. However, it reasonably appears that Defendant may attempt to use *Marinello* to, among other things, undercut the Government's

reliance on events before the 2010 grand jury subpoena for the purposes of the obstruction count. This may elevate the importance of Defendant's subpoena litigation conduct as to that count to some degree, but Defendant does not seek to preclude the *fact* of the grand jury subpoena here. Thus, the Government still has evidentiary alternatives with respect to any nexus requirement irrespective of the subpoena litigation conduct.

In any event, there are a number of dangers that substantially outweigh the probative value of this evidence. The Government advances only one argument with respect to Rule 403, and specifically prejudice: that the only prejudice to Defendant is that it tends to prove the charged conduct, which is not a valid form of prejudice. Gov't Ltr. Br. at 4. It analogizes this case to the example of "arguing in a robbery conspiracy case that evidence of one of several robberies alleged to have been committed in furtherance of the conspiracy should be precluded as unduly prejudicial because it would lead the jury to view the defendants unfavorably." *Id.* (citing *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) (suggesting act done in furtherance of conspiracy is not prior bad act under Rule 404(b), but is "part of the very act charged")).

This argument suffers from a lack of imagination. Of course, a crime committed in furtherance of a conspiracy is not a prior bad act, and thus Rule 404(b) would not prohibit its admission. As such, the Court requested submissions regarding Rule 403 and the appropriate balancing thereunder. *See, e.g.*, *United States v. Crowder*, 141 F.3d 1202, 1213 (D.C. Cir. 1998) (contrasting the two different inquiries); *United States v. Stein*, 521 F. Supp. 2d 266, 270 (S.D.N.Y. 2007) (suggesting evidence admissible under 404(b) may nonetheless be precluded under Rule 403 balancing). To be sure, a particularly effective piece of evidence for the Government, while certainly "prejudicial" to Defendant, does not, for that reason alone, inflict "unfair" prejudice on Defendant under Rule 403. *See Old Chief*, 519 U.S. at 180 ("The term 'unfair prejudice,' as to a

criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt *on a ground different from proof specific to the offense charged*." (emphasis added)) (citation omitted); *see also United States v. Castellano*, 610 F. Supp. 1151, 1163 (S.D.N.Y. 1985) (suggesting that lawyer's testimony against client, though prejudicial, was not "unfair[ly]" prejudicial simply because it established an element in RICO prosecution). However, the effectiveness of counsel's representations at proving the Government's case is not the only possible "unfair prejudice" to Defendant here. Moreover, "unfair prejudice" is not the only potential "danger" to be weighed against the probative value of a given piece of evidence under Rule 403. Thus, the analysis is more nuanced than the Government posits.

Though the Government has not specified precisely how it would present counsel's prior statements to the jury, regardless of how that is accomplished, Defendant's former attorney will be, in essence, called by the [prosecution as a witness against her. As a general matter, "[p]ermitting counsel to be called as witnesses, even in a hearing out of the presence of the jury, is a step a court should ordinarily be reluctant to take." *United States v. Melo*, 702 F. Supp. 939, 943-44 (D. Mass. 1988). Even where the attorney no longer represents the client, the practice is strongly disfavored. *United States v. Cochran*, 546 F.2d 27, 29 n.5 (5th Cir. 1977) ("The mere appearance of an attorney testifying against a former client, even as to matters of public record, is distasteful and should only be used in rare instances."). This is because there is no small possibility that the jury will infer from counsel's appearance as a government witness against his former client (or, to a lesser but certain extent, the reading of a transcript of counsel's prior statements) that his former client engaged in wrongdoing. And, even though Defendant will be represented by another attorney at her trial, jurors may be inclined to disbelieve that attorney on the improper basis that Defendant previously hired an allegedly dishonest lawyer. They may further speculate regarding the reasons

for Defendant's obtaining a new attorney. The Court is not persuaded that a limiting instruction on these subjects, though theoretically possible to draft, will do enough to mitigate these undue harms.

Moreover, admitting this evidence on its own, without explanation as to its context, is misleading and will lead to undue speculation. Even if jurors are given the limited context that Defendant was duly issued a subpoena for documents, advanced these arguments in response, and then subsequently complied, the statements on their own are not remotely conclusive of Defendant's guilt, and appear to invite more questions than they provide answers. *See, e.g., United States v. Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1993) (suggesting that time and effort to present testimony outweighed probative value of testimony in light of testimony's not being entirely conclusive of issue). The admission of this evidence on its own will inevitably cause jurors to speculate as to why counsel stated these allegedly false facts, and whether Defendant, in fact, authorized him to do so, and questions regarding defense counsel's credibility will overwhelm their deliberative process. Edward J. Imwinkelried, *A New Antidote for an Opponent's Pretrial Discovery Misconduct: Treating the Misconduct at Trial As an Admission by Conduct of the Weakness of the Opponent's Case*, 1993 B.Y.U. L. Rev. 793, 819 (1993) ("Even when it is uncontroverted that the act occurred, there may be a serious question about the motivation for the act; at the time of the act, the attorney may not have made a contemporaneous avowal of her intent. In these cases, if the judge admits evidence of the attorney's discovery misconduct, the evidence will almost inevitably inject the issue of the attorney's credibility into the case."). In other words, jurors may too hastily give Defendant's lawyer's testimony undue weight and conclude that Defendant herself acted with the requisite corrupt intent after the Government presents evidence

suggesting that her attorney made factually inaccurate representations to a court in response to the subpoena.

This brings the Court to the additional problems of needlessly consuming time and confusion of the issues. In this case, Defendant's calling her former attorney to provide the entire context for the alleged misstatements is easily anticipated. Def's Ltr. Br. at 3-4 (arguing that that defense will need to call Mr. Leibman to present to jury his state of mind when making statements, as Defendant will need to show that Leibman made no false statements and that his statements were not made with intent to further a conspiracy); *Valencia*, 826 F.2d at 175 (Meskill, J., dissenting) (suggesting that where attorney creates inconsistency at issue, a defense attorney is to be "expected to take the stand on behalf of his client to explain why the government's evidence contradicted his own"). That will lead to extended testimony which will seemingly include, among other things, defense counsel's professional background in litigating these issues, explication of defense counsel's strategy as the case progressed, the procedural postures of the parallel legal proceedings at the time the statements were made (*i.e.*, the subpoena litigation and the criminal proceedings), and the extent to which Defendant communicated with her lawyer regarding the subject matter of the representations (as well as how and when she authorized her lawyer to make those representations on her behalf). As alluded to above, one of the the many problems the Court perceives with this testimony is that the jury may conflate Defendant's lawyer's intent with Defendant's own intent. Moreover, to the extent that Defendant calls her attorney to testify, it is highly likely that the jury will learn of Defendant's invocations of the privilege, which will substantially complicate matters. The law governing the required records exception is not simple, and certainly significant instruction will be required, hardly guaranteeing a proper understanding of the governing law, and likely muddying the waters as to the issues to be

proved. *See, e.g.*, *Fisher*, 425 U.S. at 410 (discussing case-specific nuances of act of production privilege); *see also Carriles*, 832 F. Supp. 2d at 709 ("Because the invocations have such weak probative value but such a high risk of confusing the jury on the legal issues surrounding the privilege, or even more seriously risk leading the jury to convict based on acts Defendant has not been proven to have committed and is not charged with committing, the evidence must be excluded.").

At bottom, the admission of counsel's factual representations, even in the limited form proposed, will unavoidably result in a mini-trial about the adequacy of defense counsel's representation, the truth or falsity of his statements, and the merits of the legal arguments he put forward. The Court is persuaded that the finders of fact will be led so far afield from the essence of the charges to be tried that their truth-seeking mission will be lost on them; indeed,

> "[t]he candid, open, rigorous clash of ideas—not persons—is the essence of the search for truth and understanding. To allow a diversion of attention to charges and counter-charges against advocates themselves is to lose incisive focus on material issues of fact and law—the focus that characterizes the adversary system at its best and causes it to make its distinctive contribution to clearer understanding of issues, wiser decision making, and greater likelihood of achieving the goal of equal justice under law."

*United States v. LaRouche Campaign*, 682 F. Supp. 610, 615 (D. Mass. 1987).

For these reasons, counsel's alleged factual misrepresentations, even when extracted from the accompanying legal arguments, are inadmissible.

## CONCLUSION

Defendant's motion to preclude reference to the above-discussed evidence is GRANTED.[6] Because the Court concludes that this evidence must be precluded, Defendant's motion to strike is, as defense counsel suggested, rendered academic and the Court denies it as moot. The Court reserves ruling on the remainder of Defendant's application. At the upcoming April 23, 2018 status conference, the Government should be prepared to update the Court on the progress of the search of Defendant's online accounts.

**SO ORDERED.**

Dated: April 19, 2018
New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**

---

[6] As with any *in limine* motion, this ruling is subject to reconsideration should certain events unfold before or during trial that alter the admissibility calculus. *Luce*, 469 U.S. at 41–42; *see Carriles*, 832 F. Supp. 2d at 705 ("Unless and until Defendant somehow places his invocations at issue during trial, the Constitution forbids the government from referring to them."); *United States v. Ziesman*, 409 F.3d 941, 951 (8th Cir. 2005) (suggesting that, even though attorney's testifying against former client is strongly disfavored, defense's position at trial with respect to agent's credibility rendered attorney's testimony sufficiently probative).