UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-                                           S1 16 Cr. 506 (ALC)

LACY DOYLE

Defendant.


**DEFENDANT LACY DOYLE'S SENTENCING MEMORANDUM**


Dated: New York, New York          HAFETZ & NECHELES, LLP
       October 24, 2018            Frederick P. Hafetz
                                   Noah E. Shelanski
                                   10 East 40th St.
                                   New York, NY 10016
                                   Tel: 212-997-7595
                                   Fax: 212-997-7646
                                   *Attorneys for Defendant*
                                   *Lacy Doyle*

**<u>Table of Contents</u>**

Preliminary Statement……………………………………………………………..1

I.  The Section 3553(a) Factors Support a Sentence of Probation……………………………..1

   A.  History and Characteristics of Defendant……………………………………….....2

      1.  Family…………………………………………………………………… 2

      2.  Good Deeds and Devotion to Others……………………………...…………4

      3.  Community Service…...…………………………………………………8

      4.  Reputation in the Art World and Significant Efforts to Help Others in the Art Community……………………………………………………………10

      5.  Health Problems…………………………………...…………………13

   B.  Nature and Circumstances of the Offense……………………………………14

   C.  General and Specific Deterrence Factors…………………………………14

   D.  Avoiding Unwanted Disparities……………………………………………...17

Conclusion………………………………………………………………………18

**Table of Authorities**

18 U.S.C. § 3533(a)…………………………………………………………………………1

*Booker v. United States*,

    543 U.S. 220 (2005)……………………………………………………………………2

*Gall v. United States*,

    552 U.S. 38 (2007)………………………………………………………...…..2, 17

*Kimbrough v. United States*,

    552 U.S. 85 (2007)……………………………………………………………...2

*Pepper v. United States*,

    562 U.S. 476 (2011)……………………………………………………………2

*United States v. Adelson*,

    441 F. Supp. 2d 506 (S.D.N.Y. 2006)……………………………………………2

## TABLE OF EXHIBITS

Exhibit 1 – Eliza Lu Doyle letter

Exhibit 2 – Virgil Doyle letter

Exhibit 3 – Susan Powers letter

Exhibit 4 – Breandan T. Carroll letter

Exhibit 5 – Carolyn Gumpel letter

Exhibit 6 – Joe Carroll letter

Exhibit 7 – Anne Libby letter

Exhibit 8 – Mimi O'Connell Scully letter

Exhibit 9 – Michael Lopez letter

Exhibit 10 – Nyisha Randall letter

Exhibit 11 – Arlene Joy Gibson letter

Exhibit 12 – Janet Desforges letter

Exhibit 13 – Lucy Holland letter

Exhibit 14 – Noor Chadha letter

Exhibit 15 – Mary C. Solomon letter

Exhibit 16 – Bill Powers letter

Exhibit 17 – John Limpert, Jr. letter

Exhibit 18 – Dr. David S. Younger letter

Exhibit 19 – Ryan DiPeri letter

## PRELIMINARY STATEMENT

We respectfully submit this memorandum on behalf of Lacy Doyle who is scheduled to be sentenced by the Court on October 30, 2018.

Ms. Doyle, 61 years old, with an unblemished record, pled guilty to a charge of filing a false income tax return for the year 2009 pursuant to a plea agreement which stipulates that the loss is less than $15,000. We respectfully submit that the Section 3553(a) factors here strongly support a sentence of probation without home confinement as a "sufficient but not greater than necessary sentence." 18 U.S.C. § 3553(a).

As the numerous letters to the Court demonstrate, Ms. Doyle has lived a life of extraordinary devotion to others and many good deeds for family, friends and the community. The letters are a testament to her innate desire to help others. As her daughter Eliza states: "[t]his is simply the way Lacy is wired." (Ex. 1) [1].

As stated in our memorandum, we know of no tax case involving undisclosed foreign accounts in which the guideline level—as stipulated to by the government and by the Presentence Investigation Report—in which there has been a sentence of incarceration.

Ms. Doyle has accepted responsibility for her conduct. And she has already fully paid to IRS the taxes, penalty and interest for the years she is required to do so pursuant to the plea agreement.

## I.     THE SECTION 3553(a) FACTORS SUPPORT
     A SENTENCE OF PROBATION

---

[1] The letters submitted to the Court on behalf of the defendant are contained in an Appendix to this memorandum, numbered in the order in which they appear in this memorandum each with the prefix "Ex."

In Booker v. United States, 543 U.S. 220 (2005), the Supreme Court ruled that the Sentencing Guidelines were "advisory" only. *Id* at 245. District courts have a wide latitude in the circumstances deemed relevant to sentencing under 18 U.S.C. § 3553(a). Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Pepper v. United States, 562 U.S. 476 (2011).

### A.  History and Characteristics of the Defendant

Lacy's essential nature is best described by her daughter Eliza in her letter to the Court:

> What sets my mom apart is not that she is willing to take care of others; it's that she truly takes joy in it. I am fairly sure that in Lacy's eyes, compassion for others is what gives life meaning.

(Ex. 1).

As stated by Judge Rakoff in United States v. Adelson:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad…was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

The letters to the Court are a testament to Lacy's exceptional compassion and good works done for others. Her devotion to family, friends and the community is writ large in these letters.

### 1.  Family

After 22 years of marriage, Lacy and her husband Kevin Doyle separated in 2006 and divorced in 2009. At the time of the separation, their son Virgil was 15 years old and their daughter Eliza was 13. Since 2009, Lacy has lived with Joe Carroll whom she has known since

2

high school. Lacy's children, who had lived primarily with Lacy since the separation, continued to live primarily with Lacy, and then with Lacy and Joe after 2009. Joe's son Breandan lived with them for a substantial part of this time. In his letter to the Court, Virgil writes of his fear of a "fractured" family that would never be close again after his parents' separation. Similarly, Eliza writes "after my parents' split, I never thought I would experience…family closeness again." (Ex. 1). However, as Eliza states, "my mom's effort to 'blend' our family into a new one was a tremendous success…[she] is the glue holding everyone together." *Id*. Virgil writes that Lacy made the family into "the coherent and loving crowd it is now." (Ex. 2). Though the matrimonial proceeding was protracted and bitter because Kevin was "extremely difficult," Joe's sister Susan Powers observes that Lacy "never said a bad word about Kevin to the children". (Ex. 3).

Breandan, approximately 11 years old when Joe moved in with Lacy and her children, writes in his letter that "newly introduced significant others generally fall by the wayside" when divorced families come to live together, but that "Lacy has been nothing but a loving second mother to me since first we met" and a consistent "role model for not only her biological children, but I as well." (Ex. 4).  Joe's ex-wife Carolyn Gumpel, concerned about Breandan's health issues, states that Lacy was "wonderful" with Breandan and that "as mothers we bonded" and that "[o]ver the years our relationship grew closer."  (Ex. 5).

Admirable as is Lacy's devotion to family, the story of Lacy's devotion to her aged and infirm mother Zita, as related by Joe Carroll and Lacy's friends, underscores her commitment to family.

When Lacy was 4 years old, Zita divorced Lacy's father Arthur Davisson, a decorated World War II naval commander who received two Bronze Stars for his service at the Battles of

3

Iwo Jima and Okinawa. Lacy and her younger sister Darcy lived thereafter with Zita, a highly successful portrait painter, as she went through a succession of marriages to increasingly affluent husbands. Although Lacy grew up in the Upper East Side in the trappings of wealth, in fact, as the letter writers explain, Lacy endured great cruelty from her alcoholic, narcissistic mother. One example from Joe Carroll's letter will suffice here. When Lacy was 8 years old and Darcy 6, on Sunday mornings, Zita would lock them out of the apartment residence for hours giving Lacy a quarter to spend for both of them until they were permitted to return in the afternoon. (Ex. 6). Social worker and longtime friend of Lacy, Anne Libby, writes of Zita's neglect and emotional impoverishment of Lacy and Darcy: "as a social worker today I would deem their treatment as a CPS [Child Protective Services] reportable case." (Ex. 7).

As the letters make clear, this emotional abandonment of Lacy continued throughout Lacy's adult life and included Lacy's children as well. Yet, as Zita became infirm and gravely ill in the last year of her life, Lacy became fully devoted to her care and well-being. As Lacy's son Virgil writes:

> For nearly a year, Zita was in various hospitals, nursing homes, rehabilitation centers, and ultimately, hospice care. Throughout the entire process, my mom checked on Zita daily, visited her, managed her care, encouraged me to visit her (which I did) and responded to a lifetime of maternal disinterest with boundless compassion.

(Ex. 2)

### 2. Good Deeds and Devotion to Others

Joe Carroll writes that Lacy "overcame the hurdle of a spiteful and uncaring mother" to evolve into "a joyful optimistic person who brings demonstrable benefit to the world around her." (Ex. 6).

The core of Lacy's life has been an exceptional devotion to helping others and trying to make life better for them. Depicting this generosity of spirit, Lacy's daughter Eliza writes: "This is simply the way Lacy is wired." (Ex. 1).  This innate desire to help others is not limited to family; it encompasses friends, strangers, and the community. As the letters demonstrate, her many good deeds include saving a life, saving a friend's business, providing vital emotional support when needed by her friends, opening her home to friends and even strangers at critical times for them, and through her art world work, helping struggling artists survive and mentoring them.

Joe Carroll, who has known Lacy since high school and with whom Lacy has lived since 2009, recounts how Lacy saved his life when they were in high school:

> In 1974 (age 18) she saved my life after I fell down an entire flight of wet, concrete stairs at a drunken loft party in lower Manhattan. I was unconscious and was later told that I had not been breathing when Lacy pushed her way through the stunned/paralyzed crowd of onlookers to give me mouth to mouth resuscitation which saved my life. It was now the wee hours of the morning and I was too stubborn to go to the emergency room, so she stayed with me all night, keeping me awake to control for a concussion. The next day she took me to my doctor, Kevin Cahill, for an exam. He diagnosed a concussion.

(Ex. 6).

Mimi Scully, a friend for nearly forty years, describes how Lacy stepped in to help nurse her back to health after Ms. Scully was hit by a speeding car in Manhattan and rushed to the emergency room, where Lacy came and oversaw her care there. Sent home for the next week, as she lay "frightened and in excruciating pain," Lacy became her "sole caregiver for more than a week." She states: "I simply do not know how I could have managed without Lacy as my Florence Nightingale." (Ex. 8).

Michael Lopez, a hair stylist whom Lacy has known more than thirty years, writes in his letter that Lacy "saved my business." (Ex. 9).  After 9/11, his clients would not travel downtown to his salon and "[s]uddenly I had no clients and no income." Characteristically, without being asked, she opened up her home and threw a party for him, where he gave haircuts to a dozen of Lacy's friends whom she had invited to the party enabling him to make many new clients. Lacy said "this is what we do for people we love." Echoing other letter writers, Mr. Lopez states "she has made a difference in all of our lives. She is always the first to lend a helping hand."

Eliza's letter states that "[t]hroughout my life she has taken my friends under her maternal wing." (Ex. 1).  She poignantly describes how Lacy would allow her friend Ariel who did not have much money to stay at her apartment for a lengthy period of time and even hosted Ariel's family in her apartment. She relates that during college "she became like a second mom to my friend Henry." When Henry's mother died of cancer, overwhelmed, he "took a year off from college to live in New York. Lacking the funds to do this, Lacy provided him a job as an assistant, and even allowed him to live in her apartment for a few weeks." Eliza further discusses other friends struggling with financial problems whom Lacy "took under her wing," treating one "like her son," "developing a beautiful friendship with another," and providing employment to another.

Nyisha Randall, the mother of Silver Rose, a Spence School friend of Eliza from the time they were both six, movingly describes her gratitude to Lacy for watching out for Silver Rose because of Ms. Randall's inability to pick her up after school or attend school events. She writes:

> Although my daughter Silver Rose had other friends and play dates with Spence students, Lacy Doyle was the only parent in 13 years that ever saw to it that she was brought home safely back to our house in Harlem.

(Ex. 10).

She also describes how Lacy stepped in for her at school events so that Silver Rose "wouldn't feel left out." Eliza, discussing this in her letter, states: "perhaps, my mom extended herself so much for Silver Rose, seeing that Silver was essentially 'orphaned' at a family event and not wanting Silver to feel the same alienation and embarrassment as she had" because of Zita's absence. (Ex. 1).

Susan Powers, a clinical psychologist and older sister of Joe Carroll, describes her gratitude for Lacy's selfless help with her troubled granddaughter C███ (Ex. 3). C███'s mother died at an early age. When she was young, Ch███ together with her older sister, lived with their father until Ms. Powers was able to gain custody of them two years later. In those two years C███ struggled with her mother's death, substance abuse and behavioral issues. Living and working in Sag Harbor, Ms. Powers was unable to provide the support that C███ needed and did not get from her father. She writes:

> Thankfully, Lacy's home was always open to C███ with a safe place to sleep and a home-cooked meal. In the two years before I gained custody, I think that C███ must have spent an average of two days a week with Lacy. That Lacy would so selflessly take in a troubled teen and help provide her with a stable loving home while raising her own kids speaks volumes about her generous character. I cannot overemphasize how much it meant to me that Lacy gave C███ a safe space during what was a very difficult time for my family.

(Ex. 3).

So ingrained in Lacy is her devotion to others that longtime friend Mimi Scully regards Lacy as "the sister I never had." She describes how during grief-stricken periods in her life caused by the loss of two husbands to grave illness, Lacy provided critical emotional support for her, even coming from overseas with her young children to stay with Ms. Scully. She writes: "She…carried me  through two very sorrowful periods in my life…I could not have carried on without her support."  (Ex. 8).

7

Yet another example of Lacy's compassion is her devotion to Alison Hayward, her father's companion, as related in the letter from Joe Carroll. (Ex. 6). Ms. Hayward lived with Lacy's father, Arthur Davisson, in California from the 1970's until his death from cancer in 2003. When Arthur was diagnosed with cancer in 2002, Alison was then too frail to act as his caregiver. Lacy flew to her father's home where she remained for weeks, becoming a primary caregiver to her father and stabilizing the household which was in shambles because of Alison's frail condition.

Lacy promised her father that she would care for Alison for the rest of Alison's life and she did. Lacy, who had inherited the condo where her father lived with Alison allowed Alison and her blind sister Myra who had moved into the condo after Allen died to live there rent free for the next eleven years until Alison died, and Myra decided to move out. During those eleven years, Lacy devotedly oversaw their welfare, overseeing the upkeep of the condo, visiting them several times per year, arranging needed housekeeper/caretaker services for them and regularly calling the condo manager to check on the sisters. During that eleven year period, Alison and Myra were in their late 80's and 90's.

### 3. Community Service

Lacy's commitment to bettering the lives of others extends beyond friends and family. She has made substantial contributions to the community in promoting racial diversity in education, housing the homeless and significantly helping the careers of struggling artists.

Arlene Gibson, ███████████████████████, in her letter describes the significant role that Lacy, in the early 2000's, as president of the Spence alumnae board and member of the board of trustees played in the successful efforts to increase student body diversity of Spence.

She writes: "this effort took hard work and Lacy was instrumental in achieving these goals." (Ex.

11).  And recognizing that increasing the diversity of the student body alone was not sufficient,

Lacy was also "critical" in the effort to:

> Ensur[e] that all students and their families felt supported and involved in the
> community. Lacy was critical in this effort…Lacy's efforts were very important
> in forcing us to realize that Spence had not always provided the support necessary
> to make minority students feel welcomed and included.

Lacy spent significant time in trying to help alleviate the New York City homelessness

problem, as described in the letter to the Court from Janet Desforges. (Ex. 12).  Ms. Desforges,

who spent much of her professional career as ███████████████████████████

███████████████, volunteered as development chairwoman of the New York Junior League,

an organization which historically had participated in the development of major social welfare

programs in the city.

In the late 1980's, "looking for a 'signature charitable project,'" the Junior League

decided to help address the problem of homelessness for single mothers and their children in the

city, a problem exemplified by "facilities such as the notorious Prince George Hotel…a squalid,

dirty and violent" hotel converted into a homeless shelter with " no support or social services"

where single mothers were housed. Because of her fundraising experience in the art museum

world, Lacy was appointed head of the fundraising effort for what became known as the Milbank

Pelham Fritz Transitional Housing Project on West 118th Street, a joint initiative with the

Children's Aid Society and New York City. After the site was purchased from the city for $1,

Lacy, acting with volunteers, worked tirelessly "devoting at least the equivalent of a full work

day each week for the next couple of years" to raise the funds to complete the project.

Not limited to fundraising efforts for the Pelham Fritz project, time consuming as that was, Lacy spent considerable time working with the Columbia University School for Social Work to undergo training for herself and provide training for other volunteers to understand "the nature of the challenges facing homeless families headed by single mothers." She also visited homeless families at the Prince George on multiple occasions to observe firsthand the severe problems of these families and to ensure the availability of the needed support social services for the homeless families once they moved to Pelham Fritz. The project opened in 1990, successfully creating 35 units of desperately needed safe transitional housing.

Of Lacy's contribution to this estimable project, Ms. Desforges writes:

> [o]ver 1200 families have been "housed and helped" over the past 20 years. The success of Pelham Fritz is in no small part due to Lacy's efforts.

(Ex. 12).

### 4. Reputation in the Art World and Significant Efforts to Help Others in the Art Community

Lacy has developed an outstanding reputation in the art world based on her ability, expertise and integrity. After obtaining a graduate degree in art history, she worked at the National Endowment of the Arts, as an assistant at a prestigious art gallery, and then had a long employment at MOMA. In the late 1990's, at the suggestion of knowledgeable persons in the art world, she began giving art tours for groups as a business called Artview. Lacy's art tour business flourished because her close connections with museum officials and gallery owners in the city as well as her knowledge of art and her focus were among the most highly regarded in the city. Her growing reputation was enhanced by prestigious teaching assignments at New York City museums and art societies in Palm Beach, Florida, where she also spent time.

The art tour business ended in 2012 so that Lacy could spend more time on her growing art consulting business which had developed from her art tours. The art consulting business involved advising clients on art purchases from galleries. As the letters to the Court from her clients and colleagues in the art world demonstrate, Lacy was highly valued as a consultant for her extensive knowledge and judgment. Friend Lucy Holland, a former colleague at ███████, writes that Lacy "is one of the country's top contemporary art advisors." (Ex. 13).  Carolyn Gumpel, whose family was well known in the art world states that Lacy had a "stellar reputation" in the art world.  (Ex. 5).  Noor Chadha, ████████████████████████, observed the "high regard" for Lacy by gallery owners.  (Ex. 14).

It is not just for her expertise that Lacy has been so highly regarded as an art advisor. It is also because of her honesty in a field in which dishonesty is rife. In the art consultant business, compensation of the advisor is based on a percentage of the sale price of the art purchased by the client—the higher the price, the higher the commission to Lacy. Lacy's friend and client, Mary Solomon summarizes Lacy's honesty:

> My professional interaction with Lacy has shown me how special she is in the world of art consultants. I have witnessed how many art consultants are focused solely on steering their clients to purchase works of well-established, and hence more expensive artists. This of course earns those art consultants a larger commission on any sales. In contrast, Lacy is most concerned with educating her clients about talented emerging artists, both as a way of helping these emerging artists and to provide her clients with the best value. I can assure you that this dedication to artists and her clients makes her unique in her field.

(Ex. 15).

Significantly, Lacy has employed her outstanding reputation for expertise and integrity in the art world to perform extensive good works in the art community by promoting struggling

11

artists and academics beginning their careers. Lacy's commendable efforts have not only

benefitted these individuals but have also enriched the cultural life of the city.

As Bill Powers, Joe Carroll's nephew and a respected gallery owner, writes:

> [T]here is a clichéd vision of the "starving artist." However, there is more than a little truth in this caricature. It is enormously difficult for the vast majority of very talented artists to earn a viable living creating art. Lacy…has made it her mission to try and support struggling artists in her work as an art consultant.

(Ex. 16).

Similarly, Joe Carroll, in his letter describes Lacy's passionate devotion to helping others

in the art world:

> A long list of artists and art industry professionals credit her with their success. Lacy has always been passionate about art and believes that talented artists should be able earn a living creating art.  Lacy pounds the pavement in every neighborhood in New York searching out unrecognized artists and little-known art galleries.  When she finds a talented artist, she works tirelessly to bring those artists to the attention of her clients, gallery owners, and museum professionals. She also helps to mentor the artists on the business of art, such as pricing and marketing, which are often talents that creative types are lacking.

(Ex. 6).

Demonstrating Lacy's commitment to helping struggling artists is the story told in Joe

Carroll's letter of Lacy bringing an art tour group to Chelsea immediately after 9/11. In 2001

Chelsea had not developed into the trendy art gallery venue it now is. Gallery owners there

mainly sold the work of struggling artists and were fearful that 9/11 would collapse their

businesses. Lacy committed to help struggling artists, led art tour groups within days after 9/11

to show support for those artists, and promoted the sale of their work to art tour groups who

frequently purchased art.

Noor Chadha who, after graduating with a Fine Arts degree, began her career ████████ ███████████████████████, has witnessed Lacy's "focus on helping emerging artists earn a viable living creating art. Lacy has always sought out talented but unknown artists and worked tirelessly to expose their work to her clients and the wider art world." (Ex. 14).

In addition to the invaluable help Lacy has given to struggling artists, her ingrained desire to help others in the art community includes also the valuable mentoring that she has provided to young professionals just beginning in their careers.

John Limpert, former director of the ████████████████████████ for whom Lacy worked in the 1980s, describes her serving "as a mentor to a number of people in the department." (Ex. 17).  Noor Chadha, Lacy's ███████████████████, relates the valuable advice Lacy gave her outset of her own career as an artist.  (Ex. 14).  Joe Carroll and Lucy Holland describe Lacy's continued mentoring of struggling artists and beginning art professionals. Ms. Holland, a longtime friend and colleague, writes:

> Lacy's generous mentorship has continued apace throughout her professional life since ██████…taking on recent grads as her assistants and growing them out of her office into their own careers…Lacy is always extending the gift of her knowledge to others.

(Ex. 13).

## 5. Health Problems

As stated by Dr. David Younger in his letter to the Court, ████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

**B.  Nature and Circumstances of The Offense**

By her plea of guilty, Lacy has taken full responsibility for the crime committed by her.

Without in any way intending to diminish the wrongfulness of her conduct, we observe that the

crime to which Lacy pled guilty and is being sentenced here is a false filing of a tax return for the

year 2009 resulting, as stated in the plea agreement, in a stipulated tax loss of no more than

$15,000.

**C.  General and Specific Deterrence Factors**

Neither general not specific deterrence is an issue here.

The offense here is uncharacteristic of Lacy's life which has been unblemished and, as

discussed above, been one of exemplary devotion to family, friends, and community. There is no

risk of recidivism here.

Beyond this, Lacy has already suffered significant consequences from her guilty plea.

Her guilty plea in May 2018 received wide coverage in the media, particularly in the art world.

In addition to the personal humiliation and disgrace caused by this negative publicity, Lacy's

hard-earned and deserved reputation from thirty-five years in the professional art world has been

damaged, possibly irretrievably. Her art business is in great jeopardy.

Joe Carroll describes this in his letter to the Court:

> One of the hardest aspects of the conviction on Lacy has been how it has affected her art consultation business, and, by extension, her ability to assist artists.  Lacy has always maintained a sterling representation as an art consultant, including being a member of the highly selective and prestigious Association of Professional Art Advisors.  However, as soon as she was convicted, the APAA suspended Lacy from the organization, and a simple Google search for Lacy Doyle returns almost exclusively negative press about Lacy, much of it in art industry publications.  Collectors depend on the expertise of reputable art advisors to help them buy art.  Having lost her APAA affiliation and due to the negative press, Lacy has seen a sharp drop off in her business.  Fearing even a whiff of scandal, at least half of the art galleries that Lacy has previously done business with refuse to speak to her anymore, cutting off crucial avenues for Lacy's remaining customers to buy and sell their artwork – a source of her commissions – and further restricting Lacy's ability to operate her business.  At this point, Lacy is not sure whether her art consultancy business will be able to survive the damage the conviction has caused to her reputation.   As painful as it has been to see her hard earned and deserved reputation suffer, it has especially painful to Lacy because she is no longer able to provide struggling artists with the same access to the customers, galleries, and curators who now shun her because of the conviction.

(Ex. 6).

In addition to the public humiliation and crippling of her business as a result of her felony

conviction, Lacy has also suffered other significant consequences as a result of her guilty plea in

May.  Lacy had maintained a long-term banking relationship with Chase for both her business

and personal accounts.  Following Lacy's conviction, Chase informed her in late August that it

would terminate her accounts as of October 20, 2018.

Lacy immediately began trying to open new bank accounts well in advance of this

October 20 termination date set by Chase.  This process was hindered by the fact that many

banks Lacy approached refused to open accounts for her after a due diligence search by them

disclosed her felony conviction.  After spending many days in this effort to open new accounts, she was finally able to do so.  In her belief that Chase would not terminate her accounts until October 20, Lacy had written checks on the Chase accounts to open these new accounts. Suddenly, without any warning, on September 20 Chase terminated Lacy's accounts.

Chase's early termination threw Lacy's financial life into chaos.  The outstanding checks that Lacy had written to open new bank accounts bounced.  And checks she had written on the Chase accounts to vendors for the conduct of her daily life based on Chase's October 20 termination date also bounced.  Creating even further chaos, Chase terminated Lacy's online access to her accounts at the time it terminated her bank accounts, thus making it impossible for her to have timely notice of which checks would bounce so that she could issue replacement checks on the new accounts. Nor was she able to ascertain which of the numerous "auto-pay" recipients had not been paid from her accounts.  As of the date of submission of this memorandum, Lacy is still waiting for Chase to provide her with records from her accounts so that she can address the havoc it caused in her life by Chase terminating her accounts early and without warning.

Additionally, after Lacy's guilty plea the brokerage firm where she had her retirement accounts terminated those accounts. Searching for a new brokerage firm, she learned that no brokerage firm would open an account for her because of her felony conviction. She then struggled to find a financial entity to which she could transfer these retirement accounts.

In short, the collateral consequences of Lacy's felony conviction have already had severe repercussions for her.

Finally, with respect to deterrence, we note that Lacy has already satisfied the financial obligations imposed upon her by the plea agreement. Under that agreement she is required to make restitution in the amount of tax due and penalties and interest thereon for the calendar years 2007 through 2016 as determined by IRS. IRS has determined that sum to be $238,444.36, of which $115,326.75 constitutes civil penalties. Lacy has paid this $238,444.36 sum by check sent to "United States Treasury" prior to sentencing on October 30.[2] Lacy has thus demonstrated acceptance of responsibility by making the IRS whole prior to sentencing through payment of the tax together with interest and penalty prior to sentencing.

In sum, we respectfully submit that the concepts of general and specific deterrence are adequately served by a sentence of probation without home confinement here. We observe here the Supreme Court's recognition in Gall v. United States, 552 U.S. at 48, that a sentence of probation is punishment amounting to a "substantial restriction of freedom."  Moreover, even a probationary sentence carries a deterrent effect for potential tax offenders.

### D.  Avoiding Unwanted Disparities

§ 3553(a) requires the sentencing court to consider the need to avoid unwarranted sentencing disparities.

To our knowledge there have been no custodial sentences imposed in any prosecution for tax-related offenses based on undisclosed foreign accounts in which the sentencing guidelines were as low as the level here—10. Accordingly, consideration of this factor supports the imposition of a sentence of probation here.

---

[2] This payment was made by a certified check sent to IRS on October 24, 2018 from Ryan DiPeri of the Bederson firm, accountants for Lacy Doyle. The certified check was drawn on a Hafetz & Necheles escrow account for Lacy. A copy of the check sent to IRS by Mr. DiPeri is attached to his letter to IRS. (Ex. 19).

## CONCLUSION

For all of the foregoing reasons, we respectfully request the Court impose a sentence of probation without home confinement.

Respectfully submitted,

By:                

      Frederick P. Hafetz (FH1219)
      Noah E. Shelanski (NS4800)
      Hafetz & Necheles, LLP
      10 East 40th Street, 48th Floor
      New York, NY 10016
      (t)(212) 997-7595
      (f) (212) 997-7646
      Attorneys for Defendant
      *Lacy Doyle*

October 24, 2018

18